MICHAEL L. JOHNSON *et al.*, Petitioners, v. CARRIE BURNETT, a Minor, *et al.*, Respondents-Appellees (Daniel D. Gabel *et al.*, Intervenors-Appellants).—DANIEL E. GABEL *et al.*, Petitioners-Appellants, v. CARRIE ANN BURNETT, a Minor, *et al.*, Respondents-Appellees.

Third District Nos. 3—88—0489, 3—88—0490 cons.

Opinion filed May 8, 1989.

Thomas W. O'Neal, of Westervelt, Johnson, Nicholl & Keller, of Peoria, for appellants.

No brief filed for appellees.

James F. Dennis, of Keokuk, Iowa, guardian *ad litem*.

JUSTICE LUND delivered the opinion of the court:

Michael and Adalee Johnson filed a petition in Hancock County seeking to adopt their niece, with the parents' consent, Hancock County case No. 87—F—62. Daniel and Nancy Gabel, the minor's foster parents, filed a petition to intervene. They also filed their own petition to adopt the minor, Hancock County case No. 88—F—3. The circuit court, pursuant to motions, dismissed the petition to intervene and the Gabels' adoption petition. The Gabels now appeal these determinations. We affirm.

On December 29, 1987, petitioners Michael and Adalee Johnson filed a petition seeking to adopt Adalee's niece, C.B. The petition alleged that C.B. was born on July 8, 1983, and had been in foster placement with the Department of Children and Family Services (DCFS), which had been appointed C.B.'s guardian without the power to consent to an adoption. The petition also included final and irrevocable consents to adoption signed by both parents on that day. The consents specifically agreed to adoption by petitioners.

On January 21, 1988, intervenors Daniel and Nancy Gabel filed a petition asking to intervene in this case. The petition alleged that they had been the foster parents for C.B. since February 8, 1986.

They also alleged they had spoken with DCFS concerning their desire to adopt C.B. They asked to be allowed to intervene and to consolidate this case with the adoption petition they filed.

On the same day, the Gabels filed their own adoption petition alleging they should be allowed to adopt C.B. because her parents had surrendered their parental rights, and the parents were unfit, requiring their parental rights be terminated.

Ultimately, on June 22, 1988, the court entered an order denying the Gabels' petition to intervene and dismissing the Gabels' adoption petition. The Gabels appeal these determinations, in case Nos. 3—88—0489 and 3—88—0490, respectively. These cases have been consolidated for appeal.

Initially, we observe that no appellee brief has been filed in this case. While it is not our position to serve as an advocate for the appellee, we find the ends of justice require we should determine the merits of the appeal. See *First Capitol Mortgage Corp. v. Talandis Construction Corp.* (1976), 63 Ill. 2d 128, 133, 345 N.E.2d 493, 495.

The trial court, in dismissing the Gabels' adoption petition, found that the Adoption Act (Act) (Ill. Rev. Stat. 1987, ch. 40, par. 1501 *et seq.*) does not authorize the filing of an adoption petition by a nonrelated party prior to the child becoming available for adoption. The court further found that C.B. was not available for adoption, as that phrase is defined. The Gabels maintain these determinations are incorrect. We disagree with the Gabels.

■ Adoption proceedings are unknown at common law and are solely the creation of statutory enactment. (*Regenold v. Baby Fold, Inc.* (1977), 68 Ill. 2d 419, 436-37, 369 N.E.2d 858, 866; *Musselman v. Paragnik* (1925), 317 Ill. 597, 599, 148 N.E. 312, 312.) Thus, it is incumbent upon the legislature to prescribe the conditions and procedures that must be followed in creating the relationship of parent and child between persons not so related by nature. (*Regenold,* 68 Ill. 2d at 437, 369 N.E.2d at 866.) Here, the clear language of the Act supports the court's decision.

■ Section 5 of the Act (Ill. Rev. Stat. 1987, ch. 40, par. 1507) provides that a proceeding to adopt a child shall be commenced with the filing of a petition. The section then sets forth different requirements for the petition, depending upon whether the child to be adopted is related. The Act defines a related child as standing in the following relationship to, at least, one of the petitioners: parent, grandparent, brother, sister, stepparent, stepgrandparent, stepbrother, stepsister, uncle, aunt, great-uncle, great-aunt, or cousin of the first degree. (Ill. Rev. Stat. 1987, ch. 40, par. 1501(B).) The Ga-

bels, being C.B.'s foster parents, are, thus, not considered related.

■■ ■ When the child to be adopted is not related, the Act requires the petition to be filed "within 30 days after such child has become available for adoption." (Ill. Rev. Stat. 1987, ch. 40, par. 1507(A).) The resolution of the question before us turns on the analysis of the above-quoted language. Section 1(F) of the Act provides:

"A person is available for adoption when such person is:

(a) a child who has been surrendered for adoption to an agency and to whose adoption such agency has thereafter consented;

(b) a child to whose adoption a person authorized by law, other than his parents, has consented, or to whose adoption no consent is required pursuant to Section 8 of this Act;

(c) a child who is in the custody of persons who intend to adopt him through placement made by his parents; or

(d) an adult who meets the conditions set forth in Section 3 of this Act." (Ill. Rev. Stat. 1987, ch. 40, par. 1501(F).)

Section 8 of the Act (Ill. Rev. Stat. 1987, ch. 40, par. 1510) provides that a consent is not necessary if the court has found that any of several certain factors, one of which is that the parents are unfit, are present.

What is evident from this analysis is the past-tense nature of the wording. The petition must be filed within 30 days *after* such a child has become available for adoption. A child is available for adoption when he "has been surrendered" and the agency "has thereafter consented," or when the appropriate person "has consented," or when the parents have placed the child in the custody of the adoptive parents. This clearly evidences an intent that the child be free for adoption before a nonrelated party can file a petition.

■ The Gabels maintain that the reference to section 8 provides an exception. They argue this authorizes nonrelated parties to file for adoption and to be allowed to prove the unfitness of the natural parents in a subsequent hearing. However, to read that reference in that fashion places it clearly against all the other definitions contained in section 1. The cardinal rule of statutory construction is to ascertain and give effect to the intent of the legislature. (*People v. Boykin* (1983), 94 Ill. 2d 138, 141, 445 N.E.2d 1174, 1175.) As discussed above, the intent of the Act is to authorize nonrelated adoptions only after the acts contained in section 1(F) have occurred. Accordingly, we believe the reference to section 8 requires that the parents be found unfit prior to the filing of a nonrelated party's adoption petition.

To hold as the Gabels suggest would allow nonrelated third parties

to file petitions to adopt their neighbor's children and attempt to prove in subsequent hearings that the parents were unfit. This is not the intent of the legislature. We acknowledge that the Gabels, as foster parents who have taken care of C.B. for much of her life, may have a closer relationship to C.B. than some of those persons defined as related in section 1. However, since adoption is solely a statutory creation, any change in this regard would need be made by the legislature.

Accordingly, we hold that a party who is not related to the child, as that phrase is defined, may not file a petition to adopt that child until after any of the acts contained in section 1(F) has occurred and, specifically, they may not file seeking to prove the unfitness of the parent in a subsequent hearing.

The Gabels suggest that, even if this court holds as we have, they should be able to file to adopt C.B. because the consent to adopt, which the parents signed in the Johnson adoption case, case No. 87—F—62, should be treated as a general surrender for adoption.

In *In re Custody of Mitchell* (1983), 115 Ill. App. 3d 169, 450 N.E.2d 368, the court addressed this very question and came to a contrary conclusion. Section 10 of the Act (Ill. Rev. Stat. 1987, ch. 40, par. 1512) contains the forms necessary for the natural parents to agree to the adoption of their children. The prescribed form of consent under section 10(A) of the Act (Ill. Rev. Stat. 1987, ch. 40, par. 1512(A)) is entitled "Final And Irrevocable Consent To Adoption." The consent form under section 10(C) of the Act (Ill. Rev. Stat. 1987, ch. 40, par. 1512(C)) is entitled "Final and Irrevocable Surrender For Purposes Of Adoption." In *Mitchell*, the consent in question was executed in conformity with section 10(A) and contained the heading of the specific case. That adoption was never consummated. Later, the trial court held that the consent acted as a general surrender for adoption and terminated the parental rights involved. The appellate court reversed. It observed there is a notable difference in the required language for a section 10(A) consent to an adoption and a section 10(C) surrender for adoption, which evidenced a legislative intent to treat the situations differently. It further concluded the consent in question conformed with section 10(A), and that section 10(A) contemplates existence of a pending petition seeking adoption of the child. It held that this consent was specific to the case it was prepared for and did not act as a general surrender.

■ Our review of the statutory framework convinces us that *Mitchell* was determined correctly. (See also the discussion in *In re Kerwood* (1976), 44 Ill. App. 3d 1040, 1044, 359 N.E.2d 183, 186.) In

the present case, the consents conformed with section 10(A), were captioned with the Johnson case heading, case No. 87—F—62, and were filed in that case. It is evident section 10(A) does contemplate the existence of a pending petition seeking adoption. (*Mitchell*, 115 Ill. App. 3d at 172, 450 N.E.2d at 370; *Kerwood*, 44 Ill. App. 3d at 1044, 359 N.E.2d at 186.) Accordingly, we hold that the consents filed are limited in applicability to the Johnson case, case No. 87—F—62, and may not be considered as general surrenders.

This determination, that the Gabels' adoption petition was properly dismissed, also partially resolves the question of whether the court erred in denying Gabels' petition to intervene in the Johnson case.

■■ ■ The authority to intervene is set forth in section 2—408 of the Code of Civil Procedure (Ill. Rev. Stat. 1987, ch. 110, par. 2—408). This provides, in subsection (b), which is involved in the present controversy, that the court in its discretion may allow a party to intervene if a statute confers a conditional right to intervene, or if the applicant's claim or defense and the main action have a question of law or fact in common. (Ill. Rev. Stat. 1987, ch. 110, par. 2—408(b).) The purpose of intervention is to expedite litigation by disposing of the entire controversy among the persons involved in one action to prevent a multiplicity of actions. (*Bishop v. Village of Brookfield* (1981), 99 Ill. App. 3d 483, 487, 425 N.E.2d 1113, 1116; *University Square, Ltd. v. City of Chicago* (1979), 73 Ill. App. 3d 872, 877-78, 392 N.E.2d 136, 140.) Before a party is allowed to intervene, that party must show that it has an enforceable or recognizable right, not simply a general interest, in the subject matter. (*In re Adoption of Ruiz* (1987), 164 Ill. App. 3d 1036, 1040, 518 N.E.2d 436, 439.) This decision lies in the sound discretion of the trial court and, unless there is a clear abuse of that discretion, the court's judgment thereon will not be disturbed. *Mississippi Bluff Motel, Inc. v. County of Rock Island* (1981), 96 Ill. App. 3d 31, 35, 420 N.E.2d 748, 752.

The Gabels' first asserted ground for intervention is their desire to adopt C.B. However, as we earlier held, they cannot maintain such an action. It is evident they possess no recognizable or enforceable right in the proceeding, and the decision denying the request to intervene on those grounds was proper.

The Gabels' second asserted ground supporting intervention is their position that they have a protected liberty interest in the continued custody of C.B. and are, therefore, entitled to the due process protections of notice and a hearing prior to C.B.'s removal. The question of the presence of such a protected liberty interest has been liti-

gated in other courts with mixed results. Some have found that it does exist. (*Brown v. County of San Joaquin* (E.D. Cal. 1985), 601 F. Supp. 653; *Rivera v. Marcus* (D. Conn. 1982), 533 F. Supp. 203; *James v. McLinden* (D. Conn. 1969), 341 F. Supp. 1233; *Berhow v. Crow* (Fla. App. 1982), 423 So. 2d 371.) A larger number have found that it does not. *Drummond v. Fulton County Department of Family & Children's Services* (5th Cir. 1977), 563 F.2d 1200; *Backlund v. Barnhart* (9th Cir. 1985), 778 F.2d 1386, 1389-90; *Kyees v. County Department of Public Welfare of Tippecanoe County* (7th Cir. 1979), 600 F.2d 693, 698-99; *Snell v. Tunnell* (W.D. Okla. 1988), 698 F. Supp. 1542, 1560; *Sherrard v. Owens* (W.D. Mich. 1980), 484 F. Supp. 728, 741, aff'd (6th Cir. 1981), 644 F.2d 542; *In re A.C.* (Iowa 1987), 415 N.W.2d 609.

Our legislature has recognized the sensitive nature of the foster-family relationship and has determined that, due to that relationship, a foster parent has a right to be given notice of any hearing under the Juvenile Court Act of 1987 where custody of the child might be changed. (Ill. Rev. Stat. 1987, ch. 37, par. 801—5(2).) However, this action is pursuant to the Adoption Act and not the Juvenile Court Act. Thus, this section is inapplicable.

In *Smith v. Organization of Foster Families for Equality & Reform* (1977), 431 U.S. 816, 53 L. Ed. 2d 14, 97 S. Ct. 2094, the Supreme Court, deciding the case on other grounds, avoided determining if such a protected liberty interest existed. The Court did state:

"Here, however, whatever emotional ties may develop between foster parent and foster child have their origins in an arrangement in which the State has been a partner from the outset. While the Court has recognized that liberty interests may in some cases arise from positive law sources [citation], in such a case, and particularly where, as here, the claimed interest derives from a knowingly assumed contractual relation with the State, it is appropriate to ascertain from state law the expectations and entitlements of the parties. In this case, the limited recognition accorded to the foster family by the New York statutes and the contracts executed by the foster parents argue against any but the most limited constitutional 'liberty' in the foster family." (*Smith*, 431 U.S. at 845-46, 53 L. Ed. 2d at 36, 97 S. Ct. at 2110.)

Recently, the Iowa Supreme Court, after analyzing the conflicting authority on this question, concluded:

"Under these authorities the key question becomes whether Iowa law creates the expectation that the foster family rela-

tionship will be permitted to continue after the children have resided with foster parents for a certain period of time." *A.C.*, 415 N.W.2d at 615.

■ Our review of the status of foster parents in Illinois convinces us that no such expectation of a continued foster placement exists. The role of the foster parent, as envisioned by Illinois law, is that of a temporary way station on the road of a child's life until the difficulties at home can be straightened out. This is evidenced by a primary goal of the Juvenile Court Act of 1987, which is to strengthen family ties whenever possible. (Ill. Rev. Stat. 1987, ch. 37, par. 801—2; *In re Polovchak* (1981), 104 Ill. App. 3d 203, 209, 432 N.E.2d 873, 878.) Even in those cases where it is necessary to place the child outside the home in foster placement, the goal is still to reunify the original family. The Adoption Act creates a period of 12 months after removal of the child in which the parents must make reasonable progress toward the child's return or be found unfit. (See Ill. Rev. Stat. 1987, ch. 40, par. 1501(D)(m).) However, this 12-month period should not be considered as an outer limit beyond which the foster parents can reasonably expect a long-term placement, resulting in creation of a liberty interest. While the failure to make such reasonable progress can result in termination of parental rights, it is also possible that the parents, due to their individual shortcomings, can make reasonable progress in a 12-month period, but this progress may not be enough to justify return of the child at that time. Thus, even though the foster relationship would continue, the parties would still be working towards reunification, and the temporary nature of the foster relationship would continue. These are the parameters that foster parents agree to work under when they contract with DCFS.

It is understandable that, after a period of years, a bonding within the foster family would occur which would make separation difficult. It is with this in mind that the legislature has expanded the definition of unfit parents and shortened time periods involved to attempt to free as many children for adoption as the natural parents' conduct will justify, and to avoid long-term foster placements with the heart-wrenching separations created by return or adoption elsewhere. It is this bonding which is also the reason the legislature has required that foster parents, who have had custody of their charge for over 12 months, be given first consideration in adopting that child by guardians who have the power to consent to the child's adoption. (See Ill. Rev. Stat. 1987, ch. 40, par. 1519.1.) However, none of this changes the intended temporary nature of the relationship into which foster parents agree to enter. Accordingly, we concur with the majority of

courts and hold that, since Illinois law does not create an expectation of a continued relationship, foster parents have no constitutionally protected liberty interest in the continued custody of their charges.

Affirmed.

McCULLOUGH, P.J., and GREEN, J., concur.